MICHAEL RAY HOGAN, Appellant, v. WARDEN, ELY STATE PRISON, Respondent.

No. 23193

May 3, 1996                                916 P.2d 805

---

*Michael Pescetta,* Nevada Appellate and Postconviction Project, Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General and *Robert E. Wieland,* Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, SHEARING, J.:

### FACTS

On September 29, 1993, we issued an opinion in Hogan v. Warden, 109 Nev. 952, 860 P.2d 710 (1993), in which we affirmed the district court's order dismissing Hogan's postconviction petition for a writ of habeas corpus. In our opinion, we concluded that the two aggravating circumstances on which

Hogan's death penalty is based are constitutionally valid. On October 18, 1993, Hogan filed a petition for rehearing. On October 27, 1993, this court filed an order substituting attorney Michael Pescetta, then Executive Director of the Nevada Appellate and Postconviction Project, as Hogan's counsel.

On December 7, 1993, Hogan filed a motion for JUSTICE ROSE's disqualification. In his motion, Hogan asserted that because JUSTICE ROSE was investigated in 1993 after he spoke to the Clark County District Attorney about a pending criminal matter, he should be disqualified from Hogan's appeal, which was pending in this court during the same time frame. On December 10, 1993, attorney Cal J. Potter III, then President of the Postconviction Project's Board of Directors, filed a notice of withdrawal of the motion for disqualification. Subsequently, on December 23, 1993, this court filed an order denying the request to withdraw the motion and noting that neither attorney Potter nor the Postconviction Project was counsel of record for Hogan.

On February 18, 1994, we denied Hogan's disqualification motion; in our order, we determined that Hogan's motion stated no legally cognizable ground warranting disqualification. On the same day (February 18, 1994), Hogan filed with this court a motion for leave to file a motion under seal. With this motion for leave, he submitted a "Motion for Disclosure of Grounds for Disqualification," which this court received. According to this motion, attorney Thomas Pitaro, then Vice President of the Postconviction Project's Board of Directors, represented JUSTICE ROSE when JUSTICE ROSE was investigated regarding his conversation with the District Attorney. Hogan maintains that attorney Pitaro also participated in the Postconviction Board's decision to withdraw Hogan's disqualification motion. According to Hogan, the fact that Pitaro represented JUSTICE ROSE and participated in making decisions about Hogan's case gives rise to a conflict, notwithstanding this court's conclusion that the disqualification motion could not be withdrawn.

On May 9, 1994, Hogan filed, through Pescetta, a motion for an order requiring the disclosure of informal judicial discipline proceedings. In this motion, Hogan seeks an order from this court directing disclosure by each justice and each judge before whom his case was previously pending of "any informal discipline, any informal arrangement to avoid discipline, or any other similar action of the Commission on Judicial Discipline, when the Commission was represented by the Attorney General or any other state prosecutor, to which the judicial officer was a party at the time [Hogan's] case was also pending." According to Hogan, this court's opinion in Whitehead v. Nevada Commission on

Judicial Discipline, 110 Nev. 380, 873 P.2d 946 (1994), reveals that in the past, the Attorney General administered "secret" disciplinary arrangements to some judges. Hogan maintains that if any judge involved in his proceedings was concurrently subject to such "secret" disciplinary proceedings, the judge would be disqualified under the Nevada Code of Judicial Conduct ("NCJC").

## DISCUSSION

### Motion for Disclosure of Grounds for Disqualification

In his motion, Hogan asks this court to take whatever action is necessary to ensure complete disclosure of information relating to the disqualification issue. We conclude, however, that Hogan's motion must be denied.[1]

First, because Hogan's motion follows an earlier motion, it constitutes a serial disqualification motion. NRAP 35(d) provides that "[s]erial motions or charges, whether entitled as separate challenges, or as supplements, or entitled in any other way, must not be filed, and will not be entertained." *See also* Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 429, 873 P.2d 946, 977 (1994) (recognizing that NRAP 35(d) precludes this court's consideration of serial disqualification motions). Therefore, Hogan's motion is procedurally deficient under NRAP 35(d). Additionally, to the extent that Hogan's motion is a supplement to his original disqualification motion, it became moot when, on February 18, 1994, we denied the original motion. *See generally* NCAA v. University of Nevada, 97 Nev. 56, 624 P.2d 10 (1981).

Finally, even considering the merits of Hogan's motion, we conclude that it sets forth no basis for disqualification.[2] This court has previously rejected a similar disqualification claim. In Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003, *cert. denied*, 493 U.S. 958 (1989), after this court had rendered

---

[1]As Hogan has not demonstrated good cause for filing a sealed motion, we deny his motion for leave to file under seal. Despite Hogan's failure to comply with NRAP 35, we direct the clerk of this court to file the motion.

[2]Pescetta recognizes that with regard to the attempt to withdraw Hogan's disqualification motion, this court correctly determined that Hogan was not represented by either attorney Potter or the Postconviction Project. Presumably, then, Pescetta also recognizes that Hogan was not represented by attorney Pitaro. Nevertheless, Pescetta inexplicably suggests that because Pitaro was involved in the Postconviction Project and formerly represented JUSTICE ROSE in an unrelated matter, JUSTICE ROSE should be disqualified.

its decision, the insurer filed a motion to disqualify former JUSTICE GUNDERSON. The motion was based, in part, on the ground that the attorney who had signed an amicus brief (Laura Wightman FitzSimmons) had simultaneously represented former JUSTICE GUNDERSON in another matter.

This court concluded that this alleged ground did not warrant disqualification. With regard to former JUSTICE GUNDERSON's simultaneous representation by attorney FitzSimmons, who had signed an amicus brief in the appeal, this court determined that FitzSimmons' involvement in the case was "extremely limited and [could not] reasonably support any inference of impropriety." *Id.* at 265, 774 P.2d at 1023. In addition, this court noted that FitzSimmons did not author the amicus brief, but merely signed it. *Id.*

Here, Hogan contends that attorney Pitaro repeatedly requested Pescetta to withdraw the disqualification motion and later moved the Postconviction Board's Executive Committee to withdraw the disqualification motion. According to Hogan, Pitaro did not vote on whether to file the notice of withdrawal but that Pitaro proposed a number of editing changes to the draft motion. Hogan does not allege that Pitaro was representing JUSTICE ROSE when the Postconviction Board's decision to withdraw the disqualification motion was made. Hogan's disqualification claim is therefore weaker than that presented in *Ainsworth,* and we conclude that Hogan has not raised a viable disqualification claim.[3]

*Motion for Order Requiring Disclosure of Informal Judicial Discipline Proceedings*

NCJC Canon 3, Section E provides, in part, as follows:

E. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasona-

---

[3]The dissenting justice protests that Hogan has been denied information from the attorney general and the district attorney and has been denied access to court files relating to the investigation of JUSTICE ROSE. He maintains that this court should direct that the district court's order sealing the files be vacated and that all of the information requested by Hogan's counsel be furnished to him. He also opines that Hogan should be permitted to bring a supplemental disqualification motion after receiving the relevant information. The basis for the dissenting justice's position escapes us. First, NRAP 35(d) precludes serial disqualification motions. In addition, Hogan's original motion for disqualification explained that he was unable to obtain relevant information from the "primary sources of information." Even so, the dissenting justice signed the order denying Hogan's motion, in which we explained that Hogan had failed to set forth a factual basis supporting the motion.

bly be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge[] of disputed evidentiary facts concerning the proceeding[.]

The Due Process Clause also prohibits a judge with a direct interest in a case from participating in its resolution. The Supreme Court has explained that an interest is disqualifying under the Due Process Clause if it "'would offer a possible temptation to the average . . . judge . . . not to hold the balance nice, clear and true.'" In Re Murchison, 349 U.S. 133, 136 (1955) (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)).

In several recent opinions, it was suggested that the Nevada Commission on Judicial Discipline had, in the past, acted outside the scope of its governing rules and the Nevada Constitution when investigating and disciplining judges. *See, e.g.,* Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 873 P.2d 946 (1994); Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 874, 879-80, 878 P.2d 913, 917 (1994). The *Whitehead* court mentioned "secret 'arbitration,' secret 'mediation' and secret 'probation.'" 110 Nev. at 416, 873 P.2d at 969. Additionally, the *Whitehead* court discussed the case of "Judge D......," who was placed on informal "probation" under the supervision of the Attorney General's office without a probable cause hearing first being held. *Id.* at 418-19, 873 P.2d at 970-71.

Although we recognize that, depending on the factual circumstances presented, a judicial disciplinary arrangement with the Attorney General's involvement could raise an appearance of impropriety under NCJC Canon 3E, *see, e.g.,* In Interest of McFall, 617 A.2d 707 (Pa. 1992), we conclude that Hogan's motion must be denied. We emphasize at the outset that Hogan has not filed a disqualification motion and has instead filed a motion for the disclosure of information. Therefore, we do not analyze whether any particular set of facts would warrant judicial disqualification. Nevertheless, several policy considerations relating to judicial disqualification are relevant to our evaluation of Hogan's motion.

To begin, the primary policy behind the Code of Judicial Conduct is to promote public confidence in the judiciary. *See* H.R. Rep. No. 1453, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355. Public confidence is not fostered by motions such as Hogan's; such motions serve only to

raise, without any factual basis, possible doubts about the impartiality of Nevada's judiciary. Subjecting judges to informational quests regarding their qualifications to sit on certain matters erodes the public's regard for the judiciary's integrity and directly contravenes the foundation on which the Code of Judicial Conduct rests.[4]

The NCJC recognizes the tension between legitimate disqualification claims and judicial maneuvering: its preamble provides that "the purpose of the Code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding." Similarly, NRAP 35 attempts to thwart attorney abuses by, *inter alia,* precluding serial disqualification motions.

Here, Hogan has filed, through attorney Pescetta, three motions relating to judicial disqualification. Although we certainly recognize that Hogan is entitled to a fair tribunal, Hogan's multiple motions give us cause for concern that he seeks to delay and manipulate his post-conviction proceedings.

In addition, we have repeatedly held that "a judge or justice is presumed not to be biased, and the burden is on the party

---

[4]We note that even if Hogan were to show that a judge involved in his proceedings was subject to an informal disciplinary arrangement, the policy of fostering public confidence in the judiciary could, depending on the facts, make retroactive relief problematic. The United States Supreme Court has concluded that in some post-judgment and post-appeal cases, retroactive relief is required. *See, e.g.,* Aetna Life Ins. v. Lavoie, 475 U.S. 813 (1986). In Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 864 (1988), the Supreme Court concluded that

in determining whether a judgment should be vacated for a violation of [28 U.S.C.] § 455(a) [the federal statute which contains the same disqualification language as NCJC Canon 3E], it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

If any judge were deemed disqualified on the basis of the Attorney General's involvement in informal discipline arrangements, this could open the door for every criminal defendant who appeared before the judge during the relevant time period. (The Attorney General is at least a nominal party in most criminal appeals filed in Nevada.) The state's efforts in the former proceedings would be invalidated, and countless new proceedings could be required in a system that is already severely backlogged.

Further, such proceedings could (again, depending on the facts) potentially undermine the public's confidence in the judiciary. *See* Polaroid Corp. v. Eastman Kodak Co., 867 F.2d 1415 (Fed. Cir.), *cert. denied,* 490 U.S. 1047 (1989) (concluding that fundamental fairness precluded vacation of judge's orders rendered over six-year period because there was little risk of injustice in other cases, public's confidence in integrity of judicial system was less likely undermined if rulings were adhered to than if vacated years later on grounds other than merits, and party bringing motion knew about disqualifying facts but remained silent).

asserting the challenge to establish sufficient factual grounds warranting disqualification." Goldman v. Bryan, 104 Nev. 644, 649, 764 P.2d 1296, 1299 (1988), *quoted in* In re Petition to Recall Dunleavy, 104 Nev. 784, 788, 769 P.2d 1271, 1273 (1988).[5] This rule promotes public confidence in the judiciary and encourages efficiency and finality in litigation. If a party fails to allege sufficient facts, summary dismissal of the motion has been deemed appropriate. *See, e.g.,* PETA v. Bobby Berosini, Ltd., 111 Nev. 431, 437, 894 P.2d 337, 341 (1995); Ainsworth v. Combined Ins. Co., 105 Nev. 237, 270, 774 P.2d 1003, 1026, *cert. denied,* 493 U.S. 958 (1989); *Dunleavy,* 104 Nev. at 789, 769 P.2d at 1273-74.

Here, although Hogan's motion is not a disqualification motion and instead seeks information regarding potential grounds for disqualification, the policy that judges are presumed unbiased applies with equal force. With regard to judicial disqualification, the *party* has the burden of setting forth sufficient facts that demonstrate bias or the appearance thereof; this standard would be set on end if a party could simply file a motion requesting judges to reveal potentially disqualifying circumstances.[6] A party cannot simply end-run the burden of production by seeking information from the court. Nevada law makes no provision for the discovery of potentially disqualifying facts from judicial sources. If parties are permitted to seek "discovery" from courts before which they appear, and to indirectly suggest that an appearance of partiality may exist, then the standard that judges are presumed *not* to be biased would be substantially eroded, especially where, as here, a matter has been finally resolved on the merits.

---

[5]*See also* United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993), *cert. denied,* ...... U.S. ......, 115 S. Ct. 2250 (1995) (concluding that "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" do not ordinarily satisfy the requirements for disqualification); Franks v. Nimmo, 796 F.2d 1230, 1235 (9th Cir. 1986) (concluding that "'[s]ection 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice'") (quoting United States v. Hines, 696 F.2d 722, 729 (10th Cir. 1982)); Austin v. State, 528 N.E.2d 792, 794 (Ind. Ct. App. 1988) (ruling that in absence of circumstances suggesting otherwise, it should be assumed that judge would have disqualified himself or herself if any reasonable question of impartiality existed).

[6]We note that while a case is pending, the judge or judges presiding over the case are encouraged by the NCJC to reveal potentially disqualifying information: "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." NCJC Canon 3E, Commentary.

In line with this view, we have previously concluded that a potential death penalty recipient has no right to *voir dire* a three-judge sentencing panel to discover how the judges were selected. Paine v. State, 110 Nev. 609, 877 P.2d 1025 (1994). In *Paine,* we recognized that

> [a] judge is required by the Code of Judicial Conduct to "respect and comply with the law and [to] act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2(A). Moreover, NRS 47.250(9), (10) and (16) specify, respectively, as disputable presumptions: "[t]hat official duty has been regularly performed;" "[t]hat a court or judge, acting as such, whether in this state or any other state or country, was acting in the lawful exercise of his jurisdiction;" and "[t]hat the law has been obeyed."

*Id.* at 618, 877 P.2d at 1030. Here, as in *Paine,* we must assume, unless Hogan independently sets forth specific facts showing otherwise, that the judges involved in his various proceedings complied with the law and were impartial.

Finally, the Nevada Constitution provides for confidentiality of judicial discipline commission proceedings: "The supreme court shall make appropriate rules for . . . [t]he confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5)(a). Rule 5(1) of the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline states that "[a]ll proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges." Rule 5(2) explains that " '[c]onfidentiality' encompasses all proceedings of the commission and all information and materials, written, recorded or oral, received or developed by the commission in the course of its work and relating to alleged misconduct or disability of a judge." Further, Rule 6 provides that "[a]ny person who breaches the confidentiality of judicial disciplinary proceedings is subject to being found guilty of contempt of the supreme court. In addition, members of the commission who are judges are subject to disciplinary proceedings before the commission for violation of this rule . . . ." We conclude that a judge's constitutional right to confidentiality must not be jeopardized by speculation or innuendo.

As explained throughout this opinion, we decline to speculate whether any particular informal discipline scenario would require disqualification. Hogan has set forth no facts suggesting that any judge involved in his proceedings was subject to the Attorney General's supervision, nor are we aware of any such facts.

Therefore, we refuse to take the extraordinary measures that Hogan requests. Hogan is not entitled to a judicial fishing expedition. We must presume, in accordance with our prior case law, the NCJC, and sound public policy, that the judges involved in Hogan's proceedings complied with the applicable law and conducted themselves in a manner consistent with the canons and policies of the NCJC. Consequently, we deny Hogan's motion for an order requiring the disclosure of informal judicial discipline proceedings.

Finally, we have considered Hogan's petition for rehearing, and we conclude that the issues raised lack merit. Accordingly, we deny the petition. NRAP 40(c).

YOUNG and ROSE, JJ., concur.

ROSE, J., concurring:

I do not respond to the many scathing, misleading and false accusations and conclusions made by JUSTICE SPRINGER in his dissent. I do caution that many factual statements made by JUSTICE SPRINGER are not accurate or complete. It is just further evidence of the animosity that CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER have toward me.

SPRINGER, J., with whom STEFFEN, C. J., agrees, dissenting:

Mindful that this is a death case, I dissent to the majority's denial of Hogan's motion to disqualify JUSTICE ROSE, who Hogan claims is prejudiced against him. I dissent also to the majority's denial of Hogan's request to be provided with certain presently-concealed documents relating to his case.

### JUSTICE ROSE'S DECIDING HIS OWN DISQUALIFICATION CHALLENGE

Strangely, JUSTICE ROSE has signed and participated in the majority opinion even though it is JUSTICE ROSE's own qualification to sit in this case that is the subject of Hogan's motion. Hogan claims that JUSTICE ROSE is disqualified to sit in his case because JUSTICE ROSE has been subject to undue influence by certain prosecutorial officials. Hogan asserts that he will be able to establish a firm factual basis for his claim if he is permitted to have access to certain secret documents and other information that has been "sealed" in district court files by Judge Nancy Becker.

JUSTICE ROSE has recently been insisting upon playing a part in decisions in which his own impartiality is being questioned. (See, for example, Snyder v. Viani, 112 Nev. 568, 916 P.2d 170 (1996); Allum v. Valley Bank, 112 Nev. 591, 915 P.2d 895

(1996); Martin v. Beck, 112 Nev. 595, 915 P.2d 898 (1996)).[1] To my way of thinking it is clearly impermissible for JUSTICE ROSE to sit in judgment of himself in these matters.

## HOGAN'S REQUEST FOR SECRET DOCUMENTS

The second reason that I dissent is that the court has before it in this case, sworn testimony submitted in support of Hogan's request for certain disclosures of concealed facts, facts which, for the most part, have been hidden from this court as well as from Hogan. A number of issues in this case rest upon the nature of the sought-after facts; and, certainly, this court is in no position to rule on Hogan's renewed motion to disqualify JUSTICE ROSE until it has gained access to and has examined the critical information that is presently being denied to Hogan and denied to this court.

Death-sentenced Michael Ray Hogan asks this court to enter an order "requiring disclosure" of certain information relating to those who sit in judgment of his life. I can think of no reason why the requested disclosure of sealed judicial materials should not be made, especially in a death case.

The attorney general vigorously opposes the disclosure of the information sought by Hogan and stridently argues that Hogan's request for information "impugns" her ethics and the "ethics of this court." One would think that the ethics of this court and of the attorney general would be enhanced rather than impugned by granting Hogan's request for full disclosure of the readily-available but "sealed" information that Hogan wishes to examine. It is my belief that Hogan is entitled to all facts that might have any relevancy to the impartiality of jurists who have "had anything to do with this case." As Hogan points out in his motion, the Judicial Code of Conduct, Canon 3(E)(1), makes it clear that a jurist should not sit on a criminal case if the prosecutorial agencies of the state have put the jurist in a compromised or vulnerable position by reasons of favors done for the jurist by the prosecutorial apparatus. That this is a problem in the present case is more than just a possibility.

---

[1]Perhaps the most extravagant example of JUSTICE ROSE's deciding matters relating to his own qualification is found in Nevada Attorney General v. Steffen, et al., Docket No. 27847, a pending case in which the attorney general has petitioned for a writ of prohibition which would prohibit the court in the *Whitehead* case, 111 Nev. 70, 893 P.2d 866 (1995), from proceeding in that case (that is to "stay all actions" of the majority justices in that case). JUSTICE ROSE has, of course, disqualified himself in the *Whitehead* case; still, he has voted in Case No. 27847 (even though he is disqualified to act in matters relating to the *Whitehead* case) to deny challenges to his own qualifications and voted to disqualify JUSTICES ZENOFF, STEFFEN and SPRINGER, the majority justices in *Whitehead*.

During the course of proceedings in this court, Hogan has expressed two concerns that give me some pause. First, he expresses his concern about certain unlawful practices that have admittedly been carried out by the Nevada Commission on Judicial Discipline. It is now clearly established that the Discipline Commission has for some time been conducting secret sessions out of which have emanated a number of unlawfully secret discipline decrees. Among these secret decrees have been orders placing judges on secret probation to the attorney general.[2] Although our order in the *Whitehead*[3] case preventing the attorney general from any further participation in judicial discipline cases precludes any future probationary control over judges by the attorney general, the practice of judicial probation was clearly going on during the time that criminal proceedings were pending against Hogan. Hogan certainly is entitled to know if any of the jurists in his case were subject to probationary supervision under the attorney general while they were deciding matters relating to his case.

It seems to me that judges who were under coercive supervision by the attorney general should not be sitting on criminal cases, at least while they were actually probationers. Hogan has asked that any probationary judge or justice who has had any decision-making power in his case be required to disclose this fact to him. This seems like a reasonable request to me. I would require all such jurists to make, on the record, not only a full disclosure of the nature of their secret probation but also a disclosure of any favorable consideration of any kind that might have been given to such jurists by the attorney general during the time that the attorney general was acting as both counsel and probation officer for the Judicial Discipline Commission.

Hogan's second concern is about the favors that he claims have been done for JUSTICE ROSE by the attorney general and the district attorney of Clark County. All of the members of this court have been made aware of the attempts by Hogan's counsel to secure secret documents relating to the questioned relationships between JUSTICE ROSE and Hogan's prosecutors. JUSTICE ROSE, himself, tells us (in his Response, filed with this court on February 7, 1994) that "[i]n the instant matter, the Clark County District Attorney found that CHIEF JUSTICE ROSE had committed

---

[2]It was only through a fortuitous array of circumstances that this court learned of the unlawful practice by the Discipline Commission of placing judges on secret probation under the control of the attorney general.

[3]Whitehead v. Comm'n on Jud. Discipline 110 Nev. 874, 878 P.2d 913 (1994).

no criminal acts,[4] and the Attorney General concurred in that conclusion.'' JUSTICE ROSE went on in the mentioned ''Response'' to announce that he became aware of the pending

[4]JUSTICE ROSE cannot accurately claim that prosecutors ''found that CHIEF JUSTICE ROSE had committed no criminal acts.'' No prosecutorial authority has ever ruled that JUSTICE ROSE has not committed any criminal acts. The attorney general, saying that it was ''questionable whether the matter submitted [by the district attorney] was within the jurisdiction of this office,'' nevertheless ''agreed with [the] analysis'' of the district attorney concerning ''alleged violations of NRS 199.520 (disclosure of information to subject of investigation) and NRS 199.540 (notification of interception of wire or oral communication).'' The district attorney had ruled that NRS 199.540 was ''inapplicable'' to the evidence uncovered in the police investigation and that ''the evidence does not support a violation of NRS 199.520.'' The district attorney decided not to prosecute the ''alleged violations''; and the attorney general agreed. This is not the same as saying that JUSTICE ROSE had ''committed no criminal acts.''

Hogan's concern here is not whether JUSTICE ROSE committed any criminal acts; rather, his only concern is whether the mentioned prosecutors' refusal to prosecute JUSTICE ROSE gives rise to the possibility that the district attorney and the attorney general might be able to exert some influence over JUSTICE ROSE. Prosecutorial influence over JUSTICE ROSE, according to Hogan, might have arisen out of the prosecutors' refusal to prosecute JUSTICE ROSE on charges of obstructing a criminal investigation or out of the ''threat, or potential threat, of prosecution [that is] universally recognized as a potent factor affecting an individual's impartiality.'' Hogan points out that the possibility of criminal violations other than those relating to obstructing a criminal investigation is ''quite real,'' citing as examples, ''NRS 197.100 (influencing public officer); NRS 197.110(2) (misconduct of public officer); NRS 197.190 (obstructing public officer)'' and other related criminal statutes. Other possible threats of prosecution might be seen under NRS 199.480(3)(f) (conspiracy to commit an act injurious to or a corruption of public justice or the due administration of law).

The gist of Hogan's moving papers is that possible favors done for JUSTICE ROSE and potential threats of further prosecution hanging over JUSTICE ROSE have placed JUSTICE ROSE in a position of conflict with respect to Hogan's conviction and death sentence. Hogan bases his assertions on factual allegations that he claims to be able to establish if he is allowed to examine the secret and ''sealed'' court documents and other materials relating to police investigations and charges relating to JUSTICE ROSE. Hogan claims that JUSTICE ROSE had certain telephone conversations with his business associate and former law clerk, Rhonda Mushkin, which were intercepted by police detectives. Hogan claims that Ms. Mushkin asked JUSTICE ROSE to help her ''in dealing with the pending criminal proceedings'' against her and that, in response to this request, JUSTICE ROSE agreed to pay a ''visit'' to the district attorney. According to Hogan, JUSTICE ROSE then ''discussed . . . the pending criminal prosecution of Rhonda Mushkin'' with the district attorney. It is reported that then CHIEF JUSTICE ROSE said to the district attorney, ''They [Ms. Mushkin and her co-defendant] would like to see it go away or diverted out of the system or something, and I would love that too.''

Simply put, Hogan's position is that the district attorney's and attorney general's refusal to prosecute charges of obstruction of a criminal investigation (disclosure of information relating to investigation and notification of

criminal charges against him "less than two weeks prior to the Attorney General's decision" not to pursue the criminal charges against him. We also learned from JUSTICE ROSE's Response that the attorney general's *nolle prosequi* decision "confirmed" a comparable decision by the Clark County District Attorney that the criminal charges against JUSTICE ROSE constituted a "'no merit' case."

In a letter directed both to the attorney general and to the Clark County District Attorney, Hogan's counsel demanded a disclosure of information relating to the criminal charges against JUSTICE ROSE that were in the hands of these mentioned prosecutorial officials. Hogan legitimately seeks out the "existence of a conflict of interest" which he claims arises out of what he sees as favoritism on the part of prosecuting officials who refused to prosecute JUSTICE ROSE. After pointing out that there was "no conceivable danger to law enforcement personnel" or other reason to withhold facts relating to the ROSE criminal investigation, Hogan's counsel made written demands upon both the attorney general and the Clark County District Attorney that they provide him with "copies of all information, including tape recordings, transcripts of tape recordings, investigative reports, and any and all other documents relating to the investigations of a justice of the Supreme Court in the matter identified by the state at Metro DR# 930625-1024." The demand was refused or ignored by the attorney general and the district attorney.

In letters to the mentioned prosecutors, Hogan's counsel correctly pointed out that the State's investigation of a justice of this court, during a time that criminal proceedings were pending in this court against Hogan, necessarily relate to "material which the state, through all of its prosecution agencies, has an obligation to disclose to opposing counsel." Hogan's counsel also correctly pointed out that "[t]here can be no rational dispute that the pendency of a criminal investigation of a jurist by counsel for the state raises a conflict of interest with respect to cases in which the state is a party." (Citing In Interest of McFall, 556 A.2d 1370 (Pa. Super. 1989), *aff'd,* 617 A.2d 707 (Pa. 1992)). Counsel also

---

interception of wire communication) and the threat of possible prosecution under NRS Chapters 197 and 199 have compromised JUSTICE ROSE in such a way as to disqualify him from sitting in judgment on Hogan's death case. Hogan complains that "the primary sources of information with respect to [JUSTICE ROSE'S] conflict are entirely unavailable" to him and that the State "has access to the records of investigation of the CHIEF JUSTICE, [but] has not disclosed the existence of the investigation or its subject" to Hogan. It seems to me that Hogan is entitled, at least, to be provided with the "primary sources of information" which are contained in the court documents sealed by Judge Becker.

cited Supreme Court Rule 179 which relates to the prosecution's duty to disclose specified information to defense counsel.

One reason (other than the refusal of the attorney general and district attorney) that Hogan's counsel had been and is presently unable to obtain the requested information is because of an order sealing the court files relating to the subject criminal investigation of JUSTICE ROSE. The order sealing these public records was signed by Judge Nancy Becker of the Clark County District Court. In my opinion, Hogan is entitled to these documents whether they are delivered by Judge Becker, the attorney general or the Clark County District Attorney. Until this information is made available to Hogan and his attorney, it is impossible for him to make adequate preparation for his intended pursuit of motions relative to the qualifications of JUSTICE ROSE to sit on his case.

In his opposition to a previous motion to disqualify JUSTICE ROSE, filed by Hogan in this case, JUSTICE ROSE resisted disqualification by pointing out that "Hogan's motion to disqualify CHIEF JUSTICE ROSE is generally deficient because it presents no facts" that established bias on the part of JUSTICE ROSE. This may have been true at the time JUSTICE ROSE wrote these words, but the reason that it was true at the time Hogan first filed his motion to disqualify JUSTICE ROSE was because the facts relating to possible favored treatment given to JUSTICE ROSE by the attorney general and the district attorney were being improperly withheld by the very persons who had at their disposal the pertinent information, namely, Hogan's prosecutors.

There is another matter, well known to the members of this court, that should persuade this court to permit Hogan to explore further the scope of possible prejudicial bias on the part of JUSTICE ROSE. I refer to the facts surrounding the mysterious "withdrawal" of Hogan's motion to disqualify JUSTICE ROSE.

The gist of Hogan's motion (the one that was "withdrawn") was his allegation that the State was holding something over JUSTICE ROSE's head that prevented him from acting fairly and impartially in criminal prosecutions in general and in Hogan's prosecution in particular. As put by Hogan, in his motion, there was a "conflict presented by the State's possession of information potentially damaging to JUSTICE [ROSE], and by the decision of relevant prosecutorial agencies to decline to prosecute." Startlingly, only three days after Hogan's defense counsel filed the mentioned motion to disqualify JUSTICE ROSE, defense counsel's employer (Nevada Appellate and Postconviction Project) filed a motion with this court to *withdraw* the motion to disqualify JUSTICE ROSE which had been filed by Hogan's personal attorney. Hogan's defense attorney was an employee of the mentioned Nevada Appellate and Postconviction Project.

The vice-president of defense counsel's employer (the Nevada Appellate and Postconviction Project, which attempted to withdraw Hogan's motion to disqualify JUSTICE ROSE) was one Thomas Pitaro. Mr. Pitaro was JUSTICE ROSE's personal attorney. Neither Mr. Pitaro nor the Project was able successfully to have the motion to disqualify JUSTICE ROSE withdrawn and the motion was eventually ruled on and denied on the paradoxical ground that Hogan was unable to support his motion with the factual material that was being denied to him by the attorney general, the Clark County District Attorney and Judge Becker.

That Hogan's counsel would be subject to interference with his attorney-client relationship, *by his counsel's employer, in a death case* is a matter of serious concern to me as it well should be to the other members of the court. All of the foregoing information appears by affidavit in the file of this matter and appears to have been totally ignored by the court.

In my opinion, the court should order that Judge Becker's order sealing the public files be vacated, that all of the information requested by Hogan's counsel be delivered to him and that the full extent of the interference with Hogan's attorney-client relationship by JUSTICE ROSE's attorney, Thomas Pitaro, and the managing officials of counsel's employer (the Nevada Appellate and Postconviction Project) should be brought to light and considered by this court. After this information has been made available to Hogan and to this court, Hogan should be permitted to bring an amended or supplemental motion to disqualify JUSTICE ROSE, and this motion should be heard in due course by this court.